T.C. Memo. 1997-468


UNITED STATES TAX COURT


MELVIN R. SWEATMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16680-94.                    Filed October 14, 1997.


<u>Linda S. Paine</u> and <u>George W. Connelly, Jr.</u>, for petitioner.

<u>Shelia Dansby Harvey</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined the following deficiency
in petitioner's Federal income tax and the following accuracy-
related penalty:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|------------|---------------------------------------|
| 1990 | $43,122 | $8,624 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

We must decide the following issues:

(1) Whether the transfer of Las Colinas Ranch from Paz Gas Corporation to petitioner, the controlling shareholder, was a sale or a dividend. We hold that the transfer was a dividend.

(2) Whether petitioner is liable for the accuracy-related penalty as determined by respondent. We hold that petitioner is so liable.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, supplemental stipulation of facts, and attached exhibits. At the time of filing the petition, petitioner resided in Cuero, Texas.

Background

Petitioner's formal education consisted of secondary school through approximately ninth grade and 2½ years of college. After college, he took a job with Houston Natural Gas, and about 16 years later became president of Houston Pipeline Company. Following this, in 1989 or 1990, he took a position as president and chief operating officer of Tejas Gas Corporation. Petitioner formed Paz Gas Corporation (Paz) in 1988, and he was the sole shareholder.

## The Ranch

Petitioner and a friend, William Anderson (Anderson), planned to acquire Las Colinas Ranch (the Ranch), in Westhoff, Texas, in order to operate a parimutuel horse-betting business. Anderson owned a corporation called Shoreline Resources, Inc., which acquired the Ranch. When Shoreline Resources acquired it, the Ranch consisted of 133 acres of land and an old, run-down frame house. Anderson paid to build the exterior shell of a ranch house on the land, but did not pay to complete the interior. Petitioner paid to complete the interior of the ranch house, paid for some repairs to the frame house, and paid for other improvements on the property. Shoreline Resources merged with Paz in December 1988, and Paz was the corporation that survived the merger, with petitioner as president and 78-percent shareholder and Anderson as 22-percent shareholder. As a result of the merger, Paz became the owner of the Ranch, with book values of $115,007 for the land and $39,000 for the ranch house. Petitioner moved to the ranch house after he left Tejas Gas Corporation in 1989 or 1990, and it was petitioner's primary residence from July 1990 to April 1991.

## The Transfer of the Ranch

Petitioner and Paz employed the accounting firm of Davidson, Eagleson & Co (Davidson, Eagleson). John Eagleson (Eagleson), a partner with Davidson, Eagleson, was an officer and director of Paz. Davidson, Eagleson prepared tax returns for both petitioner

and Paz; in addition, Davidson, Eagleson also kept the books and functioned as in-house accountant for Paz.

In 1990, petitioner began contemplating sale of the Ranch. Before doing so, because he believed that he had title to some of the improvements and Paz had title to the remainder of the Ranch, he wanted to get title in one name to facilitate sale. Therefore, he decided to cause Paz to transfer the Ranch to him. Petitioner discussed the idea of transferring the Ranch with Audrey Kuntz (Kuntz), an accountant employed by Davidson, Eagleson at that time. In April 1990, Kuntz wrote an agenda for an upcoming meeting with petitioner, in which she noted a question as to when petitioner was going to "purchase" the Ranch from Paz. She met with petitioner in June 1990, and in her notes of the meeting, she stated that petitioner planned to sell the Ranch in about a year, that petitioner would "buy" the Ranch from Paz, and that Davidson, Eagleson would draw up a 2-year demand note for petitioner's "purchase" of the Ranch.

Another accountant at Davidson, Eagleson, Stephen Guerra (Guerra), was responsible for reviewing petitioner's and Paz's tax returns. Petitioner also met with Guerra in June 1990, and they talked about the idea of petitioner purchasing the Ranch from Paz, discussing sales price and financing. Petitioner believed the fair market value of the Ranch was less than book value, but Guerra suggested that he buy the Ranch at book value to avoid a bargain sale characterization. With respect to a

promissory note, Guerra advised petitioner that it should be in writing and should reflect a market rate of interest.

The transfer of the Ranch from Paz to petitioner was accomplished by warranty deed on July 2, 1990. Petitioner did not execute a promissory note at the time of the transfer.

After the Transfer

In the period of July through September 1991, Michelle Youngs (Youngs), also of Davidson, Eagleson, began preparing Paz's books for 1990 and Paz's 1990 tax return. She came upon the notes that Kuntz had written in 1990 with respect to the transfer of the ranch. This was the first she learned of the transfer. She asked Eagleson whether she needed to book the transfer and whether it in fact had taken place. He confirmed that the transfer had occurred, so Youngs made accounting adjustment entries to reflect the sale of the Ranch to petitioner. Youngs recorded the transfer on Paz's books as a note receivable from shareholder in the amount of $154,007, the book value of the Ranch prior to the transfer. In addition, Youngs prepared Paz's 1990 tax return, on which Paz reported the $154,007 amount as a loan to shareholder and the transfer as a sale of a capital asset.

At the time of the transfer of the Ranch, petitioner was married to Linda Glass Sweatman. In June 1991, as part of their divorce agreement, Linda Glass Sweatman conveyed her interest in the Ranch to petitioner.

In August 1991, petitioner sold the Ranch for $200,000, taking a promissory note for $150,000 and the remainder in cash.[1] In October 1992, petitioner assigned this promissory note to a bank for $167,342.82 cash.

The Note

In May 1992, Youngs was preparing petitioner's 1991 tax return. When attempting to calculate petitioner's gain or loss on the sale of the Ranch, she realized there was no note with respect to the transfer of the Ranch. She raised this point with Eagleson, who said he would prepare a note. In May 1992, Eagleson prepared a promissory note (the Note) with respect to the transfer, and in June 1992, petitioner executed it.

The date appearing in the top right corner of the Note executed in June of 1992 was July 2, 1990, which was the date of the transfer of the Ranch. The Note listed the Ranch as security, stating that "payment of this note is secured by that tract of land [i.e., the Ranch] * * * more fully described in the Deed executed on this date, July 2, 1990." There was no date next to petitioner's signature at the end of the Note. The Note called for annual payments beginning July 2, 1992.

The Audit

Guerra next became significantly involved with the details of the transfer of the Ranch in July 1993, when an audit of Paz

---

[1] Settlement expenses were $13,873.70 and taxes were $1,568.32, so petitioner received net cash of $34,557.98.

was taking place. Prior to July 1993, in response to a document request dated February 8, 1993, Guerra sent Revenue Agent Allen Sohrt (Agent Sohrt) a copy of the Note, which was unsigned. On July 16, 1993, Guerra met with Agent Sohrt, at which time Agent Sohrt requested a signed copy of the Note as well as copies of any checks showing payments on the Note. Guerra looked for the documents requested at the July 16 meeting and did not find any copies of checks, so he notified Eagleson. On July 22, 1993, petitioner made his first payment on the Note, equal to two principal payments of $15,400 each and interest accrued to date of $36,961.68. On August 2, 1993, Guerra sent Agent Sohrt a signed copy of the Note and stated in a cover letter that petitioner had missed the first payment due on the Note (the July 2, 1992, payment), in part because of the failure of the accountants at Davidson, Eagleson to notify him the payment was due. At the time he sent this letter, Guerra had not been made aware that the Note had been signed in 1992, and the letter made no mention of when the Note had been signed. On October 8, 1993, Agent Sohrt wrote Guerra asking petitioner to provide a signed statement as to when the Note had been signed. Later that month Guerra drafted a letter for Eagleson's signature stating that the Note had been signed on or shortly after May 26, 1992, even though it was effective July 2, 1990. This letter advised that the accountants were partly responsible for the failure to prepare the Note at the time of the transfer of the Ranch.

Earnings

Paz reported retained earnings of $376,792 at the beginning of the year in issue and $566,944 at the end of the year in issue.

OPINION

Respondent determined that the transfer of the Ranch was a dividend from Paz and therefore income to petitioner.[2] Petitioner contends, however, that the transfer was pursuant to his purchase of the Ranch from Paz, in which the purchase price was advanced to petitioner by Paz in exchange for a promissory note. It is respondent's position that petitioner did not intend to pay for the Ranch, and consequently that dividend treatment is appropriate. Petitioner's contention requires us to decide whether a bona fide indebtedness was created between Paz and petitioner, its controlling shareholder, when the transfer occurred. The question of whether an advance by a corporation to its shareholder is a dividend or a loan is a recurrent one, the central issue therein being whether the parties to the alleged loan intended to create a bona fide indebtedness. See, e.g., Alterman Foods, Inc. v. United States, 505 F.2d 873 (5th Cir. 1974), and cases cited therein; Electric & Neon, Inc. v.

_____

[2] In the notice of deficiency, respondent determined that the value of the dividend to petitioner was $154,007, the book value of Ranch at the time of the transfer.

Commissioner, 56 T.C. 1324, 1338-1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).

A determination of whether there was an intent to create bona fide indebtedness depends on all the facts and circumstances; not every factor gets equal weight, and no one factor is controlling. Alterman Foods, Inc. v. United States, supra at 876 n.6. Arrangements between a corporation and a controlling shareholder are subject to close scrutiny. Electric & Neon, Inc. v. Commissioner, supra at 1339.

Based on the evidence in this case, we conclude that there was no intention to create bona fide indebtedness or to repay the advanced amounts when petitioner received the Ranch from Paz, and consequently the transfer constituted a dividend. We base this conclusion on the numerous instances in which petitioner disregarded the purported debt and his obligations thereunder.

First, no promissory note evidencing petitioner's indebtedness to Paz was drafted or executed at the time of the transfer of the Ranch to petitioner. This "error" was not corrected until approximately 2 years later when an accountant at Davidson, Eagleson who was attempting to compute petitioner's gain or loss on the later sale of the Ranch discovered that there was no note. As a result, Paz was unsecured during this period. The absence of a written promissory note was not corrected when petitioner sold the Ranch to third parties, even though petitioner contends that the Ranch was security for the

indebtedness to Paz. When the Note was executed in June of 1992, the Ranch had already been sold. Yet the Note continued to recite the Ranch as security. Thus Paz remained effectively unsecured. Petitioner argues that the failure to execute a note was due to the oversight of his accountants, but we note that petitioner observed other formalities with respect to title to the Ranch, such as obtaining his wife's community interest in the Ranch prior to their divorce. We believe that the failure to draft or execute a note evidencing petitioner's indebtedness to Paz for nearly 2 years, and the failure to provide security when purporting to do so, reveal that both borrower and lender treated the obligation casually at best. We believe that greater care would have been exercised in these matters if the purported debt had been intended as a genuine obligation.

Second, and of most significance, petitioner failed to make any payments with respect to the indebtedness, even though they were past due under the terms of the subsequently drafted Note, until a revenue agent auditing Paz made specific inquiries regarding the transaction. The Note required annual payments, commencing 2 years after the July 2, 1990, transfer of the Ranch to petitioner, namely July 2, 1992. Nonetheless, despite the fact that the Note had been executed by petitioner in June 1992 after its absence had been discovered, petitioner failed to make the first payment due 1 month later on July 2, 1992. Petitioner also failed to make the second payment, due July 2, 1993.

Indeed, no payments were made on the Note until July 22, 1993, after a revenue agent auditing Paz met with one of petitioner's accountants and requested a signed copy of the Note and evidence of repayment. Petitioner contends that his failure to make payments when due resulted from oversight, specifically, his failure to recall when payments were due and the failure of his accountants to remind him. We do not find this contention credible. Even accepting the view that petitioner was a busy executive who relied on his accountants, we do not believe that he could fail to recall at some point, over a period exceeding 3 years, his obligation to repay $150,000 on which interest was accruing, particularly in light of the fact that, during such period, he liquidated the asset that was the purported security for the obligation. Petitioner received substantial cash upon the sale of the Ranch to third parties in August 1991, and while this was concededly before the agreed due date of his first repayment, payment on the Note was past due when petitioner converted the third-party purchasers' promissory note to cash in October 1992. We believe that if petitioner had intended to create bona fide indebtedness to Paz, he would have made some payment on the Note prior to a request by a revenue agent for evidence of repayment.

Finally, the circumstances surrounding the ex post facto execution of the Note cast doubt upon the bona fides of the obligation and upon the credibility of petitioner and his

principal accountant, Eagleson. Petitioner concedes in testimony that the Note was not executed until June of 1992. However, the Note on its face is misleading as to the execution date in two key respects. First, although there is no date next to petitioner's signature, the date July 2, 1990 (the date of the transfer of the Ranch to petitioner), appears at the top of the Note. Second, the text of the Note states that payment is secured by the tract of land "more fully described in the Deed executed on this date, July 2, 1990" (emphasis added); this implies that the Note was executed on the same date as the deed. The only other date that appears on the Note is the due date of the first payment under the Note, July 2, 1992. It is true that Eagleson disclosed the actual date the Note was executed after probing by Agent Sohrt, but the fact remains that the Note was misleading on its face. In addition, at the time the Note was executed, petitioner no longer owned the property recited as security in the Note, which creates another misleading element. The discrepancies surrounding the date of execution and the Note's security cast doubt upon the bona fides of the indebtedness that the Note purported to memorialize.

Based on the foregoing factors, we conclude that there was no bona fide indebtedness between petitioner and Paz. Accordingly, we uphold respondent's determination that the transfer of the Ranch to petitioner was a dividend to him.

## Accuracy-Related Penalty

In the notice of deficiency, respondent determined that petitioner was liable for the accuracy-related penalty under section 6662(a) on the ground that the entire deficiency was attributable to (1) negligence or disregard of rules or regulations and (2) substantial understatement of income tax. See sec. 6662(b)(1) and (2). "[T]he term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Sec. 6662(c). A substantial understatement is an understatement of tax that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d). Petitioner will be relieved of the accuracy-related penalty under either theory if there was reasonable cause and petitioner acted in good faith. Sec. 6664(c). Petitioner has the burden of proof to show reasonable cause and good faith. Rule 142(a). Petitioner argues that even if we uphold respondent's deficiency determination, he is not liable for the accuracy-related penalty because he reasonably relied on his accountants. See Chamberlain v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228. For the reasons underlying our conclusion that petitioner did not intend to create bona fide indebtedness, discussed above, we also conclude that petitioner's reliance on

his accountants was not reasonable.  Therefore, petitioner has not shown reasonable cause for his failure to include the receipt of the Ranch in income.  Accordingly, petitioner is liable for the accuracy-related penalty pursuant to section 6662(a) as determined by respondent.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.